# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**BENNIE PETERSON,**

           **Plaintiff,**

**-vs-**                                        **Case No. 6:10-cv-1817-Orl-31KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

           **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**:

      This cause came on for consideration without oral argument on the Complaint filed by Bennie Peterson, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 10, 11. This case was referred to me for issuance of a Report and Recommendation.

## I.      PROCEDURAL HISTORY.

      In March 2008, Peterson applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*., (sometimes referred to collectively herein as the Act). R. 120-27. He alleged that

he became disabled on June 5, 2004. R. 120, 126. Peterson's applications were denied initially and on reconsideration. R. 47-50, 60-69, 72-75.

Peterson requested a hearing before an administrative law judge (ALJ). R. 76-80. An ALJ held a hearing on October 21, 2009. Peterson, represented by an attorney, testified at the hearing. R. 26-46.

After considering the testimony and the medical evidence presented, the ALJ determined that Peterson was insured under OASDI through December 31, 2005. R. 13. The ALJ found that Peterson had not engaged in substantial gainful activity since June 5, 2004, the alleged onset date of his disability. *Id*.

The ALJ concluded that the medical evidence showed that Peterson had the following severe impairments: asymptomatic HIV, status post left extremity fracture and history of substance abuse. R. 13. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations. R. 14.

The ALJ concluded that the evidence showed that Peterson's alleged mental impairment fully resolved as of November 2008. Therefore, the ALJ concluded that Peterson did not have a severe mental impairment. R. 13-14.

The ALJ found that Peterson had the residual functional capacity (RFC) to perform a wide range of sedentary work,[1] despite occasional postural limitations in climbing, balancing, stooping, kneeling, crouching and crawling.  R. 14.

Relying on the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ concluded that Peterson was not disabled pursuant to Medical-Vocational Rule 201.28.  R. 18.

Peterson requested review of the ALJ's decision.  R. 4.  On October 5, 2010, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 1-3.  Peterson seeks review of this decision by this Court.  Doc. No. 1.

## II.    JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3),1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

    (1)    Is the claimant presently unemployed?

    (2)    Is the claimant's impairment severe?

    (3)    Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

    (4)    Is the claimant unable to perform his or her former occupation?

    (5)    Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n. 2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## IV.    STATEMENT OF FACTS.

After a thorough review of the record, I find that the pertinent facts are adequately set forth in the ALJ's decision and the parties' memoranda. Therefore, I will only summarize the relevant facts to protect Peterson's privacy to the extent possible.

*A.    Personal Information and Work History.*

Peterson was born in 1964. R. 29. He completed twelfth grade at Wymore Technical School. He lived in a housing program until he was discharged for fighting on August 18, 2008. R. 447. He lived in his mother's home after she died. R. 29.

Beginning in 1999, Peterson worked at Central Florida Construction for two or three years. He was a laborer and then a mason tender until he injured his back. R. 32. Prior to that, he was a

laborer at Accord Industries or Hughes Supplier. He also did masonry work on the weekend and worked at a nursery and as a janitor. R. 32.

    *B.    Medical Records.*

An examination by the Department of Corrections on August 18, 2005 showed that Peterson had normal strength and range of motion in his arms. R. 218.[2] A positive HIV test was noted. R. 219. A chest x-ray was normal. R. 285. On August 18, 2005, the Department of Corrections clinic prescribed several medications, including Zithromax, Crixivan, Narvix, Bactrion DS and Combivir. R. 231. A psychological screening form indicated that Peterson had previously used drugs but was treated at a drug treatment center. He completed school through the twelfth grade and had an IQ of 89. He attempted suicide in 2004 and had been on antidepressant medication. R. 295. His mental status was within normal limits. R. 296. His energy level was within normal limits and his memory was intact. R. 297.

The clinic continued to monitor Peterson and changed his HIV medication on February 13, 2006 because his medication was making him sick. He also complained of a skin rash. R. 229. On May 31, 2006, he complained of blurred vision. The clinic planned to review his medications and side effects. R. 228, 236. A chest x-ray on June 8, 2006, was normal. R. 288. On August 30, 2006, he had extremely dry skin and congestion. R. 227. On November 30, 2006, the clinic noted no side effects from his HIV. He had no skin rash and mild dryness. R. 226.

On February 27, 2007, he reported on and off back pain but no fatigue and no dizziness. He was diagnosed with an inflammation of hair follicles (folliculitis) on his face and arms. R.

---

[2] Peterson was incarcerated from 2005 through February 2008. R. 396.

225.  An x-ray of the lumbar spine showed early degenerative changes, including disc narrowing at L4-5 and L5-S1 and a transitional S1 segment.  R. 286.  In May 2007, Peterson reported no side effects with his new medication, Atripla.  R. 223-24.  A Florida Department of Corrections chronic illness report indicated Peterson had "no side effects" on December 2, 2007.  R. 222.

On October 9, 2007, Peterson was involved in a fight with another inmate and injured his left knee, fracturing his left tibial plateau.  He was given medication, Naprosyn, and a brace.  R. 232, 235. 284.  X-rays from December 2007 showed an old lateral tibia plateau fracture with possible incomplete healing and joint effusion.  R. 283.  Peterson walked with a cane but said his knee was better.  R. 222, 302.  In February 2008, he was not using the cane, and he was taking Naprosyn.  R. 233.

On February 18, 2008, a prerelease health care summary by the Department of Corrections noted Peterson was taking Atripla and Naprosyn.  R. 221, 304.  As of April 8, 2008, the Orange County Health Department indicated that Peterson had been released from prison and was living at the Center for Drug-Free Living.  R. 354.  An Orange County Health Department form indicated that as of April 22, 2008, Peterson had the following problems:  AIDS, eczema, possibly bipolar, history of suicide attempt, knee injury, back pain and chemical dependency by history.  R. 339.  He was taking Atripla, Ativax, Cubriderm and Naprosyn.  R. 340.

On April 22, 2008, a county health note indicated that Peterson had weight loss, diarrhea and fatigue.  He was taking Naproxen for knee pain and Atripla for HIV.  R. 349.  He had a rash on his elbows and hands.  A mental health note indicated that he was avoiding people because he became angry and lost control easily.  R. 353.

-8-

On April 24, 2008, Iraj Lou, M.D., completed a medical verification and indicated that Peterson needed to see an orthopaedist for evaluation. He noted that Peterson was unable to work for one month and that the condition was temporary. R. 323.

On April 29, 2008, Peterson treated with Donald E. Pearson, M.D., an orthopaedist. He complained of sharp pain in his left knee and some weakness. Rest helped the pain. Dr. Pearson recommended an MRI of the knee. R. 306, 311. The MRI showed the old fracture and deformed lateral meniscus and grade 3 chondromalacia of the lateral femoral condyle. Dr. Pearson recommended arthroscopy. R. 307, 309-10, 315. The surgery was delayed due to Peterson assisting his mother with her medical care. R. 308, 316. Dr. Lou prescribed a knee brace strap on May 20, 2008. R. 324.

On July 1, 2008, Dr. Lou noted Peterson had no new complaints, was wearing a knee brace and had an appointment with a surgeon for his knee. Dr. Lou noted a knee injury and back injury. R. 355.

An Orange County mental health note from D. Orr, Ph.D., dated July 15, 2008 indicated Peterson's mood was compromised by many frustrations including accessing services and delays and denials of his disability request. He felt he could not do any work and felt the old anger returning. He felt the need to isolate himself at his mother's house rather than risk lashing out physically at others. He was exhausted by the effort of controlling his behavior but responded well to supportive reframing. R. 352. He was diagnosed with dependent personality traits. R. 352. On July 29, 2008, he remained in a generally positive mood due to his faith. When he became tired, sick or disappointed, his mood was dysphoric and irritable. He had an underlying

fear of becoming ill and he used his muscular physique to defend against that fear. He was to continue supportive counseling. R. 352.

On July 30, 2008, Maria Rosario[3] completed a Physical Residual Functional Capacity Assessment. R. 51-58. She indicated Peterson could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and sit stand and/or walk 6 hours in an 8-hour workday with unlimited pushing and pulling. R. 52. He could occasionally climb ramps/stairs and ladders/ropes/scaffolds and occasionally balance, stoop, kneel, crouch and crawl. R. 53. She noted his symptoms were credible based on objective and clinical evidence. R. 56.

On July 30, 2008, Jeffrey Prickett, Psy.D., completed a Psychiatric Review Technique form (PRTF). R. 325-38. He indicated that there was insufficient evidence and did not indicate any disorders or limitations on functioning. *Id.*

A mental health note from Dr. Orr dated August 13, 2008 indicated Peterson was in counseling regarding his current physical capabilities and he was doing well in housing. R. 351. Dr. Orr indicated on August 28, 2008 that Peterson had an altercation at supportive housing and was living with his mother. R. 351. On September 2, 2008, Peterson complained that he did not have enough food at home to keep his muscles in shape. He felt dizzy and weak and complained of left shoulder pain. R. 351.

A county health record dated September 2, 2008 indicated Peterson was not eating enough and he was encouraged to increase his exercise to thirty minutes per day, five days per week. On

---

[3] It appears that Rosario is a single decisionmaker, not a physician, based on the lack of a medical consultant's code in the form. R. 58. It would be helpful if the Commissioner would identify single decisionmakers as such in its memorandum.

September 9, 2008, Dr. Orr noted that Peterson was making progress in his spiritual life and continued supportive visits to his mother. He would continue counseling. R. 347.

On September 23, 2008, Peterson complained to Dr. Lou of being depressed, irritable and tired all the time. R. 345. Dr. Lou diagnosed him as bipolar and advised him to see a psychiatrist. R. 346. Dr. Lou completed a questionnaire on October 1, 2008. He indicated that Peterson had a history of knee and back injury with physical limitations of walking and lifting objects. Dr. Lou circled that Peterson could perform "No Duties whatsoever." R. 202, 344. On October 15, 2008, Dr. Lou indicated that Peterson could not complete his community service hours due to illness. R. 203.

Dr. Orr noted on September 23, 2008 that Peterson had recurring back pain that was relieved by repositioning. His mood was euthymic despite knowing his mother would die soon. He was supported by strong spirituality. R. 343. On October 21, 2008, Peterson was noted to be doing well mentally despite the death of his mother. Dr. Orr prescribed Seroquel and Wellbutrin. R. 343.

On October 14, 2008, Peterson treated at Florida Hospital for eczema. R. 442-46. He was given medications. R. 442. On October 23, 2008, he was prescribed additional medications for allergies. R. 438.

On November 4, 2008, Dr. Orr indicated that Peterson was upbeat and positive despite his mother's death two weeks ago. He had a strong purpose in ministering to active drug addicts. R. 422.

-11-

On November 4, 2008, Michael Harrell, Ph.D., examined Peterson at the request of the SSA. R. 396-98. Peterson took the city bus to the appointment. Dr. Harrell noted that Peterson was easily aroused to anger and frustration and required considerable calming during the interview. His mood was depressed. Peterson stated that he preferred to be alone and had trouble adjusting after prison. He spent time working out to remain healthy and preserve muscle mass. Dr. Harrell diagnosed a moderate depressive disorder, not otherwise specified, with dysthymic and anxious features and a moderate personality disorder, not otherwise specified, with anti-social features. Dr. Harrell estimated that Peterson's current GAF and GAF for the past year was 60.[4] R. 397. He noted that Peterson was easily agitated when around others and remained unsettled in life outside of prison. He would require supervision of funds. R. 398.

Catharina Eeltink, Ph.D., completed a Mental Residual Functional Capacity Assessment on November 14, 2008, after review of Peterson's records. R. 369-71. She opined that Peterson was moderately limited in the ability to do the following: understand, remember and carryout detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or

---

[4] The Global Assessment of Functioning (GAF) scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th Ed. 1998) (hereinafter *Synopsis of Psychiatry*). A GAF score of 51 to 60 reflects "[m]oderate symptoms (eg, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or coworkers)." *Id.*

peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. R. 369-70. She stated that Peterson would be able to remember and carry out short and simple instructions. Dr. Eeltink noted that Peterson might have some difficulty sustaining attention and concentration for extended periods and completing a workday at a reasonable pace. He would generally be able to relate adequately in the workplace but may have some difficulties with supervisors and coworkers due to his irritability. He may have some difficulty adapting to change but overall would be able to complete simple tasks on a continuing basis from a mental standpoint. R. 371.

Dr. Eeltink also completed a PRTF. She indicated in that form that Peterson had a depressive disorder and a personality disorder, not otherwise specified. R. 376, 380. He would have moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace. R. 383. He had very strong coping strategies and allowed himself to receive support. R. 385.

On November 18, 2008, Dr. Orr indicated that Peterson was stable and remained upbeat. R. 422.

Clarence Louis, M.D., completed a Physical Residual Functional Capacity Assessment on November 22, 2008. R. 387-94. Dr. Louis opined that Peterson could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit and stand and/or walk 6 hours in an 8-hour day with unlimited pushing and pulling. R. 388. He could frequently climb ramps and stairs and balance, could occasionally stoop, kneel, crouch and crawl, and should never climb

-13-

ladders/ropes/scaffolds.  R. 389.  He noted Peterson could not have his knee surgery because he had no insurance or cash.  R. 394.

On November 25, 2008, Dr. Orr had his last session with Peterson.  Peterson indicated that he wanted to be financially independent but Dr. Orr noted that he made no moves toward that goal.  He was focused on obtaining disability.  He was making efforts to remain calm and was less easily angered and frustrated.  Peterson refused a referral for ongoing counseling.  R. 421.

On November 26, 2008, Peterson reported pain in his back and knees which he thought was attributable to a calcium deficiency in his diet.  He was tired all the time and had itching all over his body.  He did not exercise.  R. 419.

A note from Dr. Lou dated December 16, 2008 indicated Peterson had no major illness and that Peterson said he was not depressed anymore.  R. 416.  Dr. Lou wrote that bipolar had resolved.  R. 417.  On the same day, Dr. Lou wrote a letter stating that Peterson had HIV which was a chronic, progressive, totally disabling disease.  R. 448.

A dermatology note dated December 3, 2008 indicated Peterson was agitated and concerned about his itching.  He was given additional medications.  R. 418.

On January 8, 2009, Dr. Lou treated Peterson for a red itchy eye and itchy ears.  R. 414.  Peterson complained of knee pain on February 24, 2009.  He had been unable to exercise for the previous two weeks due to having the flu.  He was overweight and advised to exercise thirty minutes five times per week.  R. 411.

A dermatology note dated March 18, 2009 indicated that Peterson's skin felt better but he still had some itching, especially with sun exposure. R. 410. On March 24, 2009, he was diagnosed with an ankle injury. R. 409.

Peter Poulos, M.D., a psychiatrist at the Orange County Health Department, examined Peterson on February 16, 2009. Peterson indicated that he "[f]eels ok." R. 408. However, he reported having paranoid delusions at times. Dr. Poulos noted that Peterson's judgment was fair. He continued him on Seroquel. *Id.* On April 13, 2009, Dr. Poulos continued to note that Peterson's judgment was fair. It appears that Peterson had discontinued use of his psychiatric medication. R. 408.[5]

On April 15, 2009, Peterson complained to Dr. Lou of right ankle pain and occasional dizziness. His left knee was in a brace. R. 407. On June 1, 2009, his right ankle was still hurting and Dr. Lou recommended a repeat x-ray. R. 405-06. A right ankle x-ray showed an old healed injury of the tibia and the calcaneus as well as bony degenerative changes of the ankle and calcaneus. R. 429.

On June 17, 2009, Dr. Lou noted that Peterson was rude and unhappy because he wanted a statement that he could not work. His HIV condition was stable. Dr. Lou observed Peterson walking very fast and being energetic on his way to the appointment. However, during the appointment, Peterson said he could barely move. He was depressed and said he qualified as disabled. The doctor called this an unjustified, unreasonable demand. R. 404.

---

[5] The ALJ read "d/c" to mean discharged. R. 16. It appears that the reference more likely means discontinued. *See* Dan. J. Tennenhouse, M.D., J.D., F.C.L.M., ATTORNEYS MEDICAL DESKBOOK § 5:6 (4th ed. 2011), found online at MEDDESK § 5:6 (Westlaw).

On July 6, 2009, Dr. Poulos examined Peterson. His handwritten notes are unclear, but he prescribed Lexapro. R. 401. On August 3, 2009, Peterson told Dr. Poulos that he felt better but had mood swings and was paranoid at times. Dr. Poulos prescribed Seroquel and Lexapro. R. 401.

On August 13, 2009, it appears that Dr. Lou examined Peterson. Peterson indicated that he was sorry for his misbehavior at the last appointment and was crying. He indicated that he felt good but had a rash under his arm. R. 402.

C.     *Claimant's Hearing Testimony and Disability Reports.*

Peterson testified that he injured his back in 1997 and he had had an operation on his left knee. He wore a back brace and had physical therapy. R. 35-36, 45. He could sit about thirty minutes before his back hurt and he would have to lie down. He could stand fifteen to thirty minutes before his ankle, knee and back began hurting. If he walked a quarter of a mile, his ankle and knee would hurt. R. 35-36. He had trouble bending. He could lift twenty-five pounds but tried to only do it once, stooping instead of bending. R. 36.

Peterson reported that he had anger and a flare up of symptoms when his mother died. R. 33. In a written disability report, Peterson described having stress and anxiety, becoming angry or confused, and stated that he avoided others because it was hard to control his temper. R. 129. When he became frustrated he could not deal with people. R. 34. He slapped a man at emergency housing because he was too close. R. 43. To deal with stress, he isolated himself from people. R. 34-35, 43. In a written disability report, Peterson described anxiety attacks when around disrespectful or violent people. His medications intensified the attacks. He would lose focus and

-16-

control and would become angry. During the attacks, he was nervous, had "evil thoughts," then self pity, guilt and sometimes he would cry. R. 135, 166. Being by himself, meditation and exercise helped with his attacks. R. 134. Peterson's son wrote that Peterson had trouble getting along with others if they were disrespectful, that he tried to avoid others and that he did not handle stress or changes in routine well. R. 141-42.

During the day, Peterson would take care of his personal hygiene, read his Bible, pray, go to doctor's appointments, go shopping, cook meals, exercise, watch television and lie down. R. 37-39; *accord* R. 138-39. In a written report, Peterson indicated that bending too long caused back pain, he was congested, weak, tired, stressed, did not have a proper diet and had knee and back pain with too much stress. R. 162. He would become tired, dizzy and weak preparing meals. He could sweep, mop, clean and do laundry a little at a time but it hurt his back badly. R. 163. He shopped once a month for food, clothing and cleaning supplies. R. 164. His hobbies included singing, doing push-ups, pull-ups and dips for his health when he was able. R. 165. He needed to wear knee and back braces. R. 166. He stayed mostly to himself and only wanted to be around other people who were spiritual and were HIV positive. R. 167.

He took about three naps per day for one to two hours. R. 38. He went to church on Sundays and used to go to a men's group on Tuesdays but he had to stop due to fatigue. He stopped doing yardwork due to fatigue as well. R. 34, 39. He also experienced dizziness sometimes. R. 33.

His skin stung as a side effect from his medications and he had difficulty sleeping. R. 33. Sun exposure also caused his skin to sting. Creams did not help the stinging. R. 33. In written

disability reports, Peterson described a number of other problems including diarrhea, weight loss, fevers and night sweats, rashes and chronic infections and, rarely, thrush (sores in mouth).  R. 128. He indicated that Atripla for the HIV caused dizziness, tiredness, trouble concentrating, muscle pain, anger behavior, lightheadedness, skin sensitivity to sun, mood changes and angry behavior. R. 130, 144, 155.[6]  He took Ibuprofen and Naproxen for his back pain, which caused stomach discomfort.  R. 131.

## V.    ANALYSIS.

Peterson asserts several grounds supporting reversal.  He contends that the ALJ erred by failing to incorporate his problems with social functioning, inability to concentrate, inability to complete a normal workday or workweek into his RFC.   He contends that the ALJ failed to consider or state the weight given to Dr. Eeltink's findings regarding his ability to complete a normal workday or workweek.  He also submits that the ALJ failed to consider the limitations arising from side effects of medication.  He notes that when nonexertional limitations are alleged, the preferred method of determining work that a claimant can perform is through the testimony of a vocational expert.  Doc. No. 13 at 9 n. 1.  These are the only issues I will address.[7]

---

[6] Peterson filed a pharmacy report for Atripla.  R. 144, 299.  A Client Information Form from the HIV/AIDS drug assistance program indicated that the medications may have dangerous side effects.  R. 145.

[7] The parties were advised that issues not specifically raised would be waived.  Doc. No. 12.

*A.      Mental Functional Capacity.*

Peterson argues that the ALJ erred by failing to include limitations on social functioning, concentration and the ability to complete a normal workday and workweek in this RFC.[8]  In conjunction with this issue, he contends that the ALJ erred by failing to credit the opinion of Dr. Eeltink that he would be moderately limited in the ability to complete a normal work day and work week.  Doc. No. 13 at 15.

While the ALJ did not refer to Dr. Eeltink by name, she discussed Dr. Eeltink's opinion at step two of the sequential evaluation.  R. 13.  The ALJ acknowledged that Dr. Eeltink found that Peterson would have mild limitations in activities of daily living and moderate limitations in social functioning and concentration, persistence and pace.  She correctly indicated that Dr. Eeltink did not have the benefit of Dr. Lou's later opinion that Peterson's bipolar condition had resolved.  *Id.* Based on this analysis, the ALJ concluded that Peterson failed to establish "a continuous 12 month period in which there was a severe mental impairment."  R. 14.

The ALJ did not apply the correct legal standard in determining whether Peterson established a mental impairment.  "The duration requirement is satisfied when the disability ' . . . can be *expected to* last for a continuous period of not less than 12 months."  *Lane v. Astrue*, No. 1:09-cv-159-MP-AK, 2010 WL 2991490, at * 10 (N.D. Fla. July 28, 2010) (emphasis added) (citing 42 U.S.C. § 423(d)(1)(A)).  "While the Eleventh Circuit Court of Appeals has not decided this precise issue, other courts that have considered the durational requirement for a mental

_____

[8]  He also argues that the ALJ erred by failing to include side effects of his medications in the RFC.  This issue will be discussed *infra.*

impairment . . . have determined that a plaintiff need not show 12 months of impairment without any periods of remission." *Id.* at * 11.

The evidence before the ALJ reflected that Dr. Lou noted a possible bipolar disorder in April 2008 and that he officially made this diagnosis in September 2008. In July 2008, Dr. Orr diagnosed Peterson with dependent personality traits, which he treated with Seroquel and Wellbrutrin. In November 2008, Dr. Harrell diagnosed a moderate depressive disorder and a moderate personality disorder. While Dr. Lou determined that the bipolar disorder had resolved as of December 2008, there is no indication in the record that the depressive disorder and personality disorder resolved as of that date. As of February 2009, Dr. Poulos was treating Peterson with Seroquel. On April 13, 2009, Peterson discontinued his medication, but Dr. Poulos prescribed Seroquel and Lexapro again in July and August 2009. It appears that Peterson was still taking these medications at the time of the ALJ's hearing in October 2009. *See* R. 45-46, 208. Thus, the evidence before the ALJ showed that Peterson continued to be treated for one or more mental impairments for more than twelve months.

In light of these facts, it was incumbent on the ALJ to address whether Peterson's mental impairment had existed or would be expected to continue, despite periods of remission, for twelve months or more. Without making this finding, there is an insufficient explanation in the record for the ALJ's rejection of Dr. Eeltink's mental RFC assessments.

The ALJ also did not make his own evaluation of Peterson's mental impairment in the four areas of functioning. "[W]here a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRTF and append it to the decision,

or incorporate its mode of analysis into his findings and conclusions. Failure to do so requires remand." *See Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005).

Therefore, reversal of the ALJ's decision and remand for further proceedings is warranted.

B.      *Side Effects of Medication.*

Peterson contends that the ALJ failed to consider how side effects of his medications, including fatigue, dizziness, trouble concentrating, muscle pain, anger, lightheadedness, sun rashes and anxiety, limited his ability to work. The SSA regulations indicate that the Commissioner will consider side effects of medication in his evaluation of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).

At the hearing, the ALJ asked Peterson about the problems he was having that were keeping him from being able to work. Peterson reported fatigue, dizziness, and stinging skin. R. 33, 37-38, 39. He had previously reported this fatigue and dizziness in written disability reports. *See, e.g.,* R. 155.

The ALJ addressed Peterson's complaints of side effects of medication and found them not to be disabling. She noted that Peterson was able to perform activities of daily living, including some house work, grocery shopping, and working out, and that he was involved with his church despite these complaints. As Peterson argues, the ability to perform activities of daily living does not equate to the ability to perform sustained work activity. Nevertheless, the ALJ was entitled to rely on what Peterson admitted he could do despite side effects of medication in determining his credibility. *See Walker v. Comm'r of Soc. Sec.*, 404 F. App'x 362, 366-67 (11th Cir. 2010) (unpublished decision cited as persuasive authority). Substantial evidence in the record supports

the ALJ's credibility determination. Therefore, the ALJ did not err in considering the functional limitations arising from side effects of medication.

C.      *Application of the Grids.*

While the Grids may provide a framework for a disability determination, the Eleventh Circuit requires that an ALJ's determination that nonexertional impairments do not significantly limit basic work skills (that is, do not preclude a wide range of work at a given exertional level) be supported by substantial evidence in the record. *See, e.g., Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989) ("Absent testimony from a vocational expert, the ALJ's conclusion that appellant's mental limitations do not significantly compromise her basic work skills or are not severe enough to preclude her from performing a wide range of light work is not supported by substantial evidence."). If the Commissioner determines on remand that Peterson has any nonexertional impairments that result in limitations on the ability to work, he must cite authority for the proposition that Peterson could still perform a wide range of work at a given exertional level before relying exclusively on the Grids at step five of the sequential evaluation. The preferred method of determining whether nonexertional limitations erode the occupational base of jobs at a given exertional level is to utilize a vocational expert. *See, e.g., Foote v. Chater*, 67 F.3d 1553, 1559-60 (11th Cir. 1995).

**VI.     RECOMMENDATION.**

For the reasons set forth herein, I recommend that the decision of the Commissioner be

**REVERSED** and the case be **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further

proceedings.  It is further recommended that the Court direct the Clerk of Court to issue a

judgment consistent with its final order and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained

in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from

attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 31, 2012.

                                        *Karla R. Spaulding*
                                        KARLA R. SPAULDING
                                        UNITED STATES MAGISTRATE JUDGE


Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy